AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 21MJ8053 |
| Apple iPhone IMEI# 356437104641703 Seized as FP&F No. 2021250300006302, Item 0001 | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ SOUTHERN _____ District of _____ CALIFORNIA _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960 and 963 | Importation of a Controlled Substance; Conspiracy to Commit the Same |

The application is based on these facts:

See Attached Affidavit of Homeland Security Investigations Special Agent Andrew Lee, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Andrew Lee*
*Applicant's signature*

Special Agent Andrew Lee, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 1/22/2021 _____

*Ruth Bermudez Montenegro*
*Judge's signature*

City and state: El Centro, California

HON. RUTH BERMUDEZ MONTENEGRO, U.S. MAG. J.
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

>Samsung Note 8
>
>Seized as FP&F No. 2021250300006301, Item 0003
>
>IMEI # 358505080669167
>
>("Target Device #1")

>Apple iPhone
>
>Seized as FP&F No. 2021250300006302, Item 0001
>
>IMEI# 356437104641703
>
>("Target Device #2")

The Target Devices are currently in the possession of Homeland Security Investigations-ASAC Calexico located at 2051 N. Waterman Avenue, Suite 100, El Centro, California 92243.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 1, 2019, up to and including October 15, 2020:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.

1  **AFFIDAVIT**

2  I, Special Agent Andrew Lee, being duly sworn, hereby state as follows:

3  **INTRODUCTION**

4  1.  I submit this affidavit in support of an application for a warrant to search the

5  following electronic devices:[1]

6  Samsung Note 8

7  Seized as FP&F No. 2021250300006301, Item 0003

8  IMEI # 358505080669167

9  ("Target Device #1")

10

11  Apple iPhone

12  Seized as FP&F No. 2021250300006302, Item 0001

13  IMEI# 356437104641703

14  ("Target Device #2") (collectively "Target Devices")

15

16  as further described in Attachment A, and to seize evidence of crimes, specifically

17  violations of Title 21, United States Code, Sections 952, 960 and 963 as further described

18  in Attachment B.  The requested warrant relates to the investigation and prosecution of

19  Vilma Fabiola CAMACHO Valenzuela and Yuliana CASTRO ("Defendants") for

20  importing approximately 20.2 kilograms (44.53 pounds) of methamphetamine from

21  Mexico into the United States.  The Target Devices are currently in the custody of

22  Homeland Security Investigations-ASAC Calexico located at 2051 N. Waterman Avenue,

23  Suite 100, El Centro, California 92243.

24  2.  The information contained in this affidavit is based upon my training,

25  experience, investigation, and consultation with other members of law enforcement.

26

27  [1] I previously obtained search warrants for the below Target Devices. Based on my

28  subsequent investigation of the Defendants' joint crossing history, this warrant seeks an expanded search period for data on the Target Devices, as explained in paragraphs 14-15 and 20.

1  Because this affidavit is made for the limited purpose of obtaining a search warrant for the
2  Target Devices, it does not contain all the information known by me or other agents
3  regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3.      I have been employed as a Special Agent ("SA") with Homeland Security
Investigations (HSI) since July 2019. I am currently assigned to the HSI Office of the
Assistant Special Agent in Charge, in Calexico, California. I am a graduate of the Federal
Law Enforcement Training Center in Glynco, Georgia.

4.      During my tenure with HSI, I have participated in the investigation of various
narcotics trafficking organizations involved in the importation and distribution of
controlled substances into and through the Southern District of California. Through my
training, experience, and conversations with other law enforcement officers experienced in
narcotics trafficking investigations, I have gained a working knowledge of the operational
habits of narcotics traffickers, in particular those who attempt to import narcotics into the
United States from Mexico at Ports of Entry.

5.      I am aware that it is common practice for narcotics traffickers to work in
concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is
to smuggle controlled substances into the United States from Mexico by concealing the
controlled substances in vehicles and on persons that enter the United States at Ports of
Entry such as the Calexico Ports of Entry. With respect to the importation of narcotics in
this manner, I am aware that narcotics traffickers in Mexico frequently communicate with
the individual ("the driver" or "the pedestrian") responsible for driving the vehicle
containing the concealed narcotics into the United States or crossing the narcotics
concealed on their person into the United States. These communications can occur before,
during and after the narcotics are imported into the United States. For example, prior to
the importation, narcotics traffickers frequently communicate with the driver or the
pedestrian regarding arrangements and preparation for the narcotics importation. When
the importation is underway, narcotics traffickers frequently communicate with the driver

1 or the pedestrian to remotely monitor the progress of the narcotics, provide instructions to
2 the driver or the pedestrian and warn accomplices about law enforcement activity. When
3 the narcotics have been imported into the United States, narcotics traffickers may
4 communicate with the driver or the pedestrian to provide further instructions regarding the
5 transportation of the narcotics to a destination within the United States.

6      6.     Based upon my training, experience, and consultations with law enforcement
7 officers experienced in narcotics trafficking investigations, and all the facts and opinions
8 set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s))
9 can and often do contain electronic evidence, including, for example, phone logs and
10 contacts, voice and text communications, and data, such as emails, text messages, chats
11 and chat logs from various third-party applications, photographs, audio files, videos, and
12 location data. This information can be stored within disks, memory cards, deleted data,
13 remnant data, slack space, and temporary or permanent files contained on or in the cellular
14 telephone. Specifically, searches of cellular telephones of individuals involved in the
15 importation of narcotics may yield evidence:

16           a.     tending to indicate efforts to import controlled substances from Mexico
17               into the United States;

18           b.     tending to identify accounts, facilities, storage devices, and/or services–
19               such as email addresses, IP addresses, and phone numbers–used to
20               facilitate the importation of controlled substances from Mexico into the
21               United States;

22           c.     tending to identify co-conspirators, criminal associates, or others involved
23               in importation of controlled substances from Mexico into the United
              States;

24           d.     tending to identify travel to or presence at locations involved in the
25               importation of controlled substances from Mexico into the United States,
26               such as stash houses, load houses, or delivery points;

27           e.     tending to identify the user of, or persons with control over or access to,
28               the Target Devices; and/or

3

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

7.  On October 14, 2020, at approximately 12:00 a.m., Vilma Fabiola CAMACHO Valenzuela (CAMACHO) and Yuliana CASTRO (CASTRO), United States Citizens, presented United States Passport Cards and applied for entry at the Calexico West, California Port of Entry through the vehicle primary lanes.

8.  Customs and Border Protection Officer (CBPO) Lopez was assigned to vehicle primary lane 1 at the Calexico, CA West Port of Entry (POE).  A Silver Toyota Camry (TOYOTA) bearing California license plates (8PWE264), applied for admission into the United States.  The vehicle was driven by a subject identified as Vilma Fabiola CAMACHO Valenzuela (CAMACHO), as identified by her United States (U.S.) Passport card (C22574709).  The passenger was identified as Yuliana CASTRO (CASTRO), as identified by her U.S. Passport card (C23218445).  CBPO Lopez received a negative customs declaration from CAMACHO.  CBPO Lopez noticed that CAMACHO was conversing with CASTRO during the inspection which CBPO Lopez viewed as an attempt to avoid questioning during the inspection.  CBPO Lopez then referred the TOYOTA to the Vehicle Secondary lot for further inspection.

9.  Prior to entering the secondary inspection area, the TOYOTA was screened by the Z-portal X-ray machine.  Z-portal operator, CBPO Gaytan, screened the TOYOTA and observed anomalies in the rear seating area of the TOYOTA.  After entering the secondary lot Canine Enforcement Officer (CEO) Escobell and his Human/Narcotic Detection Dog (HNDD) screened the TOYOTA.  The HNDD alerted to the TOYOTA's exterior.  CEO Escobell had his HNDD search the interior of the TOYOTA to which his HNDD's behavior changed while in the back seat of the TOYOTA.  CEO Escobell inspected the gas tank of the TOYOTA and observed what appeared to be packages wrapped in clear plastic.

10.  In secondary inspection, the Secondary Officer, CBPO Moreno received a

4

1  negative customs declaration from CAMACHO.  During the TOYOTA's inspection,
2  CBPO Moreno discovered 39 packages from the gas tank. CBPO Moreno also discovered
3  4 packages behind the TOYOTA's backseat.  A total of 43 packages containing a white
4  crystal-like substance were found during secondary inspection.  The combined weight of
5  the packages was 20.2 kilograms (44.53 pounds).  CBPO Arredondo tested the white
6  crystal-like substance, which tested positive for properties of methamphetamine.

7      11.    CAMACHO and CASTRO were subsequently arrested and they both stated
8  they did not wish to speak to SA Lee.  The Target Devices were seized by SA Lee while
9  conducting a border search of CAMACHO and CASTRO's personal property.

10     12.    CAMACHO was shown Target Device #1 and she identified Target Device
11 #1 as belonging to her.

12     13.    CASTRO was shown Target Device #2 and she identified Target Device #2
13 as belonging to her.

14     14.    After CAMACHO and CASTRO's arrest, as part of my investigation of this
15 case, I reviewed both defendants' crossing history between the United States and Mexico
16 as documented in the TECS system. My review of the defendants' crossing history shows
17 that they began to regularly cross together into the United States from Mexico starting in
18 August 2019 and continued to do so up to the date of arrest.

19     15.    Defendants' coordinated an ongoing crossing history in the same vehicle, in
20 conjunction with the fact that narcotics were recovered in the vehicle in which both
21 defendants were occupants on October 14, 2020, while crossing into the United States from
22 Mexico, provides probable cause to believe that evidence of drug-trafficking coordination
23 between defendants or with other co-conspirators will be found between August 2019 and
24 the date of arrest.

25     16.    Based upon my experience and training, consultation with other law
26 enforcement officers experienced in narcotics trafficking investigations, and all the facts
27 and opinions set forth in this affidavit, I believe that telephone numbers, contact names,
28 electronic mail (email) addresses, appointment dates, messages, pictures and other digital

1 information are stored in the memory of the Target Devices. In light of the above facts and
2 my experience and training, there is probable cause to believe that Defendants were using
3 the Target Devices to communicate with others to further the importation of illicit narcotics
4 into the United States. Further, in my training and experience, narcotics traffickers may be
5 involved in the planning and coordination of a drug smuggling event in the days and
6 weeks—and potentially even several months—prior to an event. Co-conspirators are also
7 often unaware of a defendant's arrest and will continue to attempt to communicate with a
8 defendant after their arrest to determine the whereabouts of the narcotics. Based on my
9 training and experience, it is also not unusual for individuals, such as Defendants, to
10 attempt to minimize the amount of time they were involved in their smuggling activities,
11 and for the individuals to be involved for weeks and months longer than they claim.
12 Accordingly, I request permission to search the Target Devices for data beginning on
13 August 1, 2019—when the Defendants began to regularly cross together into the United
14 States from Mexico—up to and including October 15, 2020, the day after CAMACHO and
15 CASTRO's arrest.

16 <center>**METHODOLOGY**</center>

17     17.    It is not possible to determine, merely by knowing the cellular telephone's
18 make, model and serial number, the nature and types of services to which the device is
19 subscribed and the nature of the data stored on the devices. Cellular devices today can be
20 simple cellular telephones and text message devices, can include cameras, can serve as
21 personal digital assistants and have functions such as calendars and full address books and
22 can be mini-computers allowing for electronic mail services, web services and rudimentary
23 word processing. An increasing number of cellular service providers now allow for their
24 subscribers to access their devices over the internet and remotely destroy all of the data
25 contained on the devices. For that reason, the devices may only be powered in a secure
26 environment or, if possible, started in "flight mode" which disables access to the network.
27 Unlike typical computers, many cellular telephones do not have hard drives or hard drive
28 equivalents and store information in volatile memory within the devices or in memory

<center>6</center>

cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18.     Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

19.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

20.     I previously sought a warrant to search the Target Devices, which the court granted on October 16, 2020. *See* 20-MJ-9863 (Target Device 1); 20-MJ-9864 (Target Device 2). The date range for that original search warrant was July 15, 2020 to October 15, 2020. Another search warrant was sought and granted on December 3, 2020. *See* 20-MJ-10038 (Target Device 1); 20-MJ-10039 (Target Device 2). The date range for these search warrants was also July 15, 2020 to October 15, 2020. After reviewing TECS for these two defendants, I discovered that they started crossing from Mexico into the United States together in August 2019. As detailed above, the purpose of this search warrant is to request that the search parameters on the Target Devices be expanded back to August 1,

1  2019. Evidence obtained from the prior search of the Target Devices is not included in this
2  affidavit.

3  **CONCLUSION**

4      21.   Based on the facts and information set forth above, I submit there is probable
5  cause to believe that a search of the Target Devices will yield evidence of Defendant's
6  violations of Title 21, United States Code, Sections 952, 960 and 963. Accordingly, I
7  request that the Court issue a warrant authorizing law enforcement to search the items
8  described in Attachment A and seize the items listed in Attachment B using the above-
9  described methodology.

10      I swear the foregoing is true and correct to the best of my knowledge and belief.

11

12  *Andrew Lee*

13  Special Agent Andrew Lee
    Homeland Security Investigations

14

15      Attested to by the applicant in accordance with the requirements of Fed. R. Crim.
16  P. 4.1 by telephone on this   22   day of January, 2021.

17

18  *Ruth Bermudez Montenegro*

19  HON. RUTH BERMUDEZ MONTENEGRO
    UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28

8

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> Samsung Note 8
>
> Seized as FP&F No. 2021250300006301, Item 0003
>
> IMEI # 358505080669167
>
> ("Target Device #1")


> Apple iPhone
>
> Seized as FP&F No. 2021250300006302, Item 0001
>
> IMEI# 356437104641703
> ("Target Device #2")

The Target Devices are currently in the possession of Homeland Security Investigations-ASAC Calexico located at 2051 N. Waterman Avenue, Suite 100, El Centro, California 92243.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 1, 2019, up to and including October 15, 2020:

a.   tending to indicate efforts to import controlled substances from Mexico into the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of controlled substances from Mexico into the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d.   tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.